UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

MASTER BAYE BALAH ALLAH,

                     Plaintiff,

          -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
------------------------------------------------------------- x

**REPORT AND
RECOMMENDATION**

15 Civ. 6099 (NSR)(JCM)

To the Honorable Nelson S. Román, United States District Judge:

       Plaintiff Master Baye Balah Allah ("Plaintiff") commenced this action pursuant to 42

U.S.C. § 405(g) and/or 42 U.S.C. § 1383(c)(3), challenging the decision of the Commissioner of

Social Security ("the Commissioner"), which denied Plaintiff's applications for disability

insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits, finding him not

disabled.  Presently before this Court are: (1) the Commissioner's Motion for Judgment on the

Pleadings and to affirm the Commissioner's decision, pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure ("Rule 12(c)"), (Docket Nos. 14, 15, 25); and (2) Plaintiff's opposition

to the Commissioner's Motion for Judgment on the Pleadings, (Docket Nos. 24, 27).  For the

reasons that follow, I respectfully recommend that the Commissioner's Motion for Judgment on

the Pleadings should be denied and that the Commissioner's decision be vacated and the case be

remanded for further administrative proceedings consistent with this Report and

Recommendation.

## I. BACKGROUND

Plaintiff was born on April 11, 1965. (R.[1] 64-66, 75).  He completed four years of college. (R. 41-42).  He was previously employed as a security guard, telemarketer and "clean up man;" performed office maintenance; and was a warehouse associate and supervisor, where he was a picker and packager, and also loaded trucks. (R. 43-44, 72, 81, 198, 217, 219, 246, 252). At the time of the application, Plaintiff was homeless. (R. 173).  Plaintiff had previously filed applications for SSI and DIB on August 5, 2012; the Social Security Administration ("SSA") denied those applications on December 21, 2012. (R. 67, 76, 170).  On March 18, 2013, Plaintiff filed new applications for SSI and DIB, alleging that he became disabled and was unable to work as of August 1, 2008, due to a head injury, psychiatric problems, and pain in his right hip and knee. (R. 64-67, 75, 170-80, 193-202).  The SSA denied Plaintiff's applications on July 2, 2013. (R. 84-89).  Plaintiff appealed the denial and appeared before Administrative Law Judge ("ALJ") Robert C. Dorf on September 22, 2014. (R. 33-63).  ALJ Dorf affirmed the denial of benefits on November 4, 2014. (R. 8-27).  Plaintiff did not submit any new evidence to the Appeals Council, which denied Plaintiff's request for review on June 23, 2015. (R. 1-3).  Thereafter, Plaintiff appealed the SSA's decision by filing the present action on August 3, 2015, contending that ALJ Dorf's decision was based on errors of law and was not supported by substantial evidence in the record. (Docket No. 2).

---

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed on the Court's Electronic Document Filing System on March 16, 2016. (Docket No. 13).

### A. Plaintiff's Medical Treatment History

The record reflects treatment Plaintiff has received for his headaches, syncope, right hip pain and history of head injury.[2]

### 1. Harlem Hospital Center

In 1997, Plaintiff suffered a head injury when he was struck by an unknown individual wielding an icepick, after which he was in a coma and underwent surgery. (R. 374, Docket No. 24 at 4). Medical records dating from the late 1990s indicate that Plaintiff was seen at Harlem Hospital Center ("HHC"), among other places, for headaches and syncopal episodes related to his head injury. (R. 354-89).[3] On forms completed in June 1998, December 1998 and March 1999, Plaintiff indicated that he had been hospitalized twice over the previous year, at HHC, for head injury. (R. 358, 370, 380). He also indicated that he suffered from severe headaches and lapses in consciousness. (R. 359, 369). A letter from Dr. Tina Shih at HHC, dated December 11, 1998, stated that plaintiff could not work "due to syncopatic [sic] episodes and headaches," which he suffered from "due to head injury he sustained a year ago." (R. 368). A second, undated letter from Dr. Shih requested that Plaintiff be excused from work "due to the syncopal episodes that he suffer[ed] from." (R. 362).

Plaintiff presented at HHC on October 7, 2010, requesting a referral to see a neurologist. (R. 287-90).[4] He reported that he had experienced left-sided headaches approximately three to four times per week over the previous year. (R. 287). He was not able to identify what caused

---

[2] The record also contains a log Plaintiff kept from August 28, 2014 through September 19, 2014, tracking his headaches, blackouts and hip and knee pain. (R. 552-54). These notes have been reviewed and are generally consistent with the medical evidence that reflects headaches and syncope, and reflect that Dr. Dimitri Alvarez was Plaintiff's primary treating physician. (R. 552).

[3] At this point in time, Plaintiff used the name Steven Nichols. He later legally changed his name to Master Baye Balah Allah. (R. 46, 170, 172).

[4] These and other records are repeated at several points throughout the record; only the first instance is cited.

the headaches, and described taking "some tablet" that did not alleviate them. (R. 287). When asked about his work, he reported that he "[did] several things [that] are not illegal." (R. 287). The doctor noted that he was "very uncooperative," and that he "insist[ed]" he "just want[ed] to see a neurologist." (R. 287). He denied, *inter alia*, syncope, and his physical exam was normal, including grossly intact cranial nerves and a normal gait. (R. 288-89). He was diagnosed with headaches, possibly migraines, was prescribed Sumatriptan, and was referred to a neurologist. (R. 289).

Next, Plaintiff was admitted to HHC on September 15, 2011, and discharged on September 28, 2011. (R. 261-69). During that time, he underwent testing, and was again diagnosed with headaches, possibly migraines. (R. 261-69). On September 30, 2011, Plaintiff returned to HHC, where he was seen at a clinic for complaints of headaches, and again requested a referral to see a neurologist. (R. 283-86). Plaintiff described his headaches as episodic, occurring three to four times a week, mostly on the left side, and with no obvious exacerbating or relieving factors. (R. 283). He denied dizziness, photophobia, blurring of vision, weakness or syncope, and his cranial nerves were grossly intact. (R. 283, 284, 285). His physical exam was normal, including a normal gait. (R. 285). He reported that he had seen a neurologist at North General Hospital, but wanted to follow up at HHC. (R. 283).

Finally, on March 14, 2013, Plaintiff presented at the HHC Emergency Room complaining primarily of cotton stuck in his ear, but also reported a migraine headache that started that day. (R. 277). He stated that he had experienced headaches approximately every other day over the previous four years, and that he had an appointment scheduled with a neurologist. (R. 277). He further indicated that "nothing works for the pain," and he did not

want any medication. (R. 277). He again denied, *inter alia*, photophobia and dizziness. (R. 277, 279). Plaintiff was determined to be clinically stable, and was discharged that day. (R. 279).

## 2. North General Family Health Center

The record reflects that Plaintiff was seen by doctors at the North General Family Health Center ("NGFHC") from August 2010 through November 2012. (R. 477-532). Out of 11 visits to NGFHC during that time, seven visits were with his primary care physician, Dr. Dimitri Alvarez, (R. 481, 485, 492, 496, 505, 511, 519), five visits were specifically for pain in his head, (R. 478, 492, 496, 517, 528), and one visit was also for pain in his hip, (R. 496).

On August 4, 2010, Plaintiff presented at NGFHC complaining of "pain in head" and was seen by his neurologist, Dr. Guoping Zhou. (R. 478-80, Docket No. 24 at 4). Treatment notes from that day indicate that Plaintiff was also seen on July 23, 2010 for tension headaches, the etiology of which was unclear, and that he was referred at that time to a neurologist. (R. 478). Plaintiff reported to Dr. Zhou that he had chronic headaches, which he said had worsened over the previous two weeks. (R. 479). He described the pain as "consistent[,] throbbing" pain, on the left side of his head. (R. 479). Plaintiff further reported that he had tried Motrin, and it did not work. (R. 479). Dr. Zhou noted that Plaintiff had a "cranionectory [sic] many years ago after head trauma." (R. 479). He also noted that Plaintiff claimed to have undergone a computerized tomography ("CT") scan of his head recently, but his staff could not locate a corresponding record. (R. 479). Dr. Zhou observed that Plaintiff "appear[ed] well" and was in no apparent distress, and described him as "pleasant and cooperative." (R. 479). He prescribed Fioricet and ordered magnetic resonance imaging ("MRI"), and instructed Plaintiff to return in one month. (R. 480).

On August 23, 2010, Plaintiff saw Dr. Alvarez for a routine physical examination. (R. 481-84). Dr. Alvarez noted that Plaintiff complained of persistent, throbbing migraine headaches, on the left side of his head, which had worsened over the previous three weeks. (R. 483). He noted that Plaintiff had seen a neurologist. (R. 483). He found that plaintiff "appear[ed] well," was in no apparent distress, and was pleasant and cooperative. (R. 483). Regarding his tension headaches, Dr. Alvarez advised him to report to the emergency room if he developed neurological symptoms. (R. 483). He also advised him to take pain medication, as needed. (R. 483). Plaintiff was instructed to return in two weeks for a neurological follow-up. (R. 484).

Plaintiff saw Dr. Alvarez again for pain in his head on December 17, 2010. (R. 492-95). He complained of recurrent, throbbing headaches in the left side of his head, and described them as "radiating to his ear and left side of his neck." (R. 494). On a scale of one to ten, he assessed the pain level as a ten. (R. 494). Dr. Alvarez noted his history of head injury, and that his medications, Imitrex and Motrin, did not provide relief. (R. 494). Upon physical examination, Plaintiff was normal; he appeared well, was in no apparent distress, and was pleasant and cooperative. (R. 494). Dr. Alvarez concluded that Plaintiff should be evaluated further and instructed him to consult with a neurologist, obtain an MRI and return in approximately one week. (R. 494-95).

The next record from NGFHC is from July 31, 2012, when Plaintiff saw Dr. Alvarez for headaches and pain in his right hip that he claimed had lasted for one year. (R. 496-504). Dr. Alvarez noted that he had not seen Plaintiff since 2010. (R. 497). Plaintiff complained of intermittent, chronic, throbbing headaches on the left side of his head that lasted for several hours, reported four "episodes" the previous week, and stated that the headaches were increasing

in frequency. (R. 497). Dr. Alvarez noted that Plaintiff had seen a neurologist two years earlier, but had not followed up or undergone imaging. (R. 498). Plaintiff requested another referral to see a neurologist. (R. 498). Regarding his hip pain, Plaintiff described it as intermittent, chronic, "radiating [from] the thigh down to the knee," worse with weight-bearing activity, and as a ten out of ten. (R. 498). Dr. Alvarez assessed Plaintiff as appearing to be in moderate pain. (R. 498). He again ordered an MRI of Plaintiff's brain and referred him to a neurologist, and also ordered an x-ray of his hip. (R. 498). Plaintiff was instructed to return in one week, and had an appointment scheduled with a podiatrist at NGFHC for August 10, 2012. (R. 501, 503).

On August 13, 2012, pursuant to Dr. Alvarez's instruction, Plaintiff had an MRI of his brain. (R. 306-07). The MRI showed postoperative changes from his prior left frontal craniotomy, and an old left posterior cerebral artery territory infarction. (R. 306). There was also evidence of paranasal sinus inflammatory disease. (R. 306). However, there was no evidence of recent infarction, hemorrhage or hydrocephalus. (R. 306). A later MRI, which was compared with the August 13, 2012 MRI, showed no acute finding, and again showed evidence of the previous left frontal craniotomy. (R. 549-50). On August 13, 2012, Plaintiff also obtained x-rays of his right hip. (R. 308-09). The findings of the x-rays were compatible with moderate osteoarthrosis. (R. 308). Plaintiff next saw Dr. Alvarez on August 20, 2012, and reported that his headaches and hip pain were unchanged. (R. 507). He was referred to an orthopedist. (R. 507). On September 2, 2012, he reported intermittent, chronic pain in his left knee, which was worse with weight bearing activity.[5] (R. 513).

Approximately two years after his first appointment, Dr. Zhou evaluated Plaintiff again on September 5, 2012. (R. 515-18). Plaintiff complained of chronic headaches, and noted daily

---

[5] Dr. Alvarez later referred to Plaintiff's right knee, (R. 514); other medical records suggest that Plaintiff's right knee, rather than left knee, bothered him, (R. 316, 319-20).

pain since August 4, 2012. (R. 517). He reported that he had undergone an MRI, but neither Dr. Zhou's nurse nor Dr. Alvarez could locate the MRI report. (R. 517). Dr. Zhou suggested that Plaintiff go to the emergency room, but Plaintiff refused. (R. 517). He instructed Plaintiff to follow up in two weeks, ordered a CT scan, and prescribed Fioricet. (R. 517-18). On November 16, 2012, Dr. Alvarez noted that Plaintiff was seeing his neurologist for headaches. (R. 521). At an appointment with another NGFHC doctor on November 26, 2012, Plaintiff reported that he had pain in the left side of his head on the previous day. (R. 528).

Finally, Dr. Alvarez wrote a letter dated December 31, 2013, addressed to "[w]homever it may concern." (R. 323). In his letter, he wrote that Plaintiff had been a patient at Dr. Alvarez's practice for the prior three years. (R. 323). He wrote that Plaintiff had suffered from chronic headaches and recent episodes of loss of consciousness. (R. 323). Dr. Alvarez indicated that Plaintiff was still undergoing testing. (R. 323). He concluded that Plaintiff's "current health status would make it challenging to be productive in a competitive work environment." (R. 323).

### 3. Mount Sinai

On April 29, 2013, Plaintiff saw Dr. Winona Tse and Dr. Douglas Mayson at Mount Sinai.[6] (R. 303-05). At that visit, Plaintiff reported that he had suffered from headaches since 2008, when he was stabbed in the skull, which required bone reconstruction surgery.[7] (R. 303). He described his headaches as occurring two to three times per day, 25 out of 30 days, and lasting for three to five minutes. (R. 304). Plaintiff assessed his pain as a 15 out of ten. (R. 304).

---

[6] The Commissioner's brief describes this visit as a consultation with Dr. Winona Tse. (Docket No. 15 at 11). However, the record indicates that both Dr. Tse and Dr. Mayson evaluated Plaintiff and wrote progress notes. (R. 303). Dr. Mayson was identified by Plaintiff on his adult function report as a doctor from Mount Sinai Neurology who treated his headaches. (R. 213).

[7] Although Plaintiff indicated to several doctors that he was stabbed in the head in 2008, (e.g., R. 303, 469), the record and Plaintiff's own testimony suggest that the injury occurred in 1997, and that he suffered from injury-related symptoms beginning in the late 1990s, (R. 45, 368, 370, 372, 374-75, 380, 382-83, 385-86).

Although he said that his headaches "completely go away afterwards," he also reported dizziness with the headaches, noting the feeling was "difficult to describe," but that it was "more of a spinning sensation." (R. 304). Upon physical examination, Plaintiff had a narrow based gait, good tandem and heel and toe walk. (R. 304). The progress notes indicated that Plaintiff had tried certain medications without results. (R. 304). The assessment concluded that Plaintiff most likely had post-traumatic headaches with some neuropathic features, and that he would benefit from a prophylactic agent, which he had not yet tried. (R. 304). He was prescribed Elavil and was directed to follow up in one month, and to bring his brain MRI to the next appointment. (R. 304).

### 4. Federation Employment and Guidance Services

There are two reports in the record from Federation Employment and Guidance Services ("FEGS"). (R. 325-43, 390-437). First, FEGS social worker Charleen Jackson prepared a biopsychosocial summary of Plaintiff in October 2010. (R. 390-437). As part of that assessment, Dr. Hun Han conducted a medical examination. (R. 406-13). Next, on March 12, 2012, FEGS social worker Angela Gray prepared a second biopsychosocial summary of Plaintiff. (R. 325-43). That report included a physical examination by Dr. Fazil Hussain. (R. 337-43).

Plaintiff traveled independently, by subway, to both appointments. (R. 333, 401). Plaintiff reported to both social workers that he lived in an apartment. (R. 327, 393). In 2010, the social worker found that Plaintiff had a stable paid work history, with continuous paid employment lasting more than one year, within the previous five years. (R. 395-96). His vocational skills were in the field of security and as a supervisor. (R. 395). Plaintiff reported that he was last employed as a security guard for one year before he quit. (R. 396). Previous work included working as a supervisor at Dairyland. (R. 396). However, in 2012, the social worker

reported that Plaintiff had no employment history, no paid work experience, and he claimed he could not remember his employment history. (R. 329). He denied any vocational goals at that time, but was interested in working, subject to his medical imitations. (R. 329, 334). At both appointments, Plaintiff denied mental health-related symptoms and denied any history of mental health issues or treatment. (R. 332-33, 400-01). Regarding activities of daily living, Plaintiff reported in 2010 that he "spen[t] his day doing what he wants to do," and in 2012 that he had many hobbies and leisure activities. (R. 334, 401). At both appointments, he reported being able to do the following: (i) wash dishes; (ii) wash clothes; (iii) sweep/mop the floor; (iv) vacuum; (v) watch TV; (vi) make beds; (vii) shop for groceries; (viii) cook meals; (ix) read; (x) socialize; (xi) get dressed; (xii) bathe; (xiii) use the toilet; and (xiv) groom himself. (R. 333-34, 401-02). Although in 2010 he reported that he had contact with his friends and family, in 2012 he denied having contact with anyone. (R. 334, 402). The FEGS social worker in 2010 found that Plaintiff presented as cooperative and attentive, but at his 2012 appointment the social worker found that he was "very evasive and provided little information." (R. 334, 403).

At the 2010 physical examination with Dr. Han, Plaintiff complained of "chronic[,] intermittent[,] throbbing headaches" that were "not relieved by medication [Motrin and Fioricet]." (R. 406). On the section of the FEGS summary regarding work limitations, Dr. Han did not indicate that Plaintiff had any limitations, and his physical examination was normal. (R. 408-10). Dr. Han diagnosed Plaintiff with headaches, assessed his diagnostic status as stable, indicated that his medical condition was stable for employment, and concluded that he had no work-related limitations. (R. 406, 412). In 2012, Dr. Hussain noted Plaintiff's history of craniotomy surgery. (R. 337). Plaintiff complained of weekly headaches, which were triggered especially when he did heavy lifting. (R. 338-39). He denied dizziness, mental illness or

depression, and his physical examination was again normal. (R. 339).  In terms of work limitations, however, Dr. Hussain opined that Plaintiff had a limited ability to lift, that he could lift up to 20 pounds, one to ten times per hour, and that he was limited to a low stress environment. (R. 340, 342).  He concluded that Plaintiff had a history of headaches but a stable diagnosis. (R. 342).

## B.  Non-Medical Evidence

Plaintiff completed an adult function report in May 2013. (R. 203-24).  In it, he indicated that he had no problems with his personal care, cooked once a day, went outside every day, took walks and used public transportation by himself. (R. 204-06).  He stated that he could engage in certain activities, such as lifting under 20 pounds, standing, walking, climbing stairs, kneeling or squatting until he had pain in his knee or hip, or until he had a headache or dizziness. (R. 208-09).  He reported having no problems reaching, using his hands, seeing, hearing or talking. (R. 208).  He further indicated that he could finish what he started and could follow spoken and written instructions. (R. 210).  He described his pain as occurring daily, at least three times per day, and claimed he had 25 headaches per week and 300 headaches per year. (R. 212, 214).  He reported that his last headache and his dizziness lasted for over five minutes. (R. 214).  When asked what he was able to do prior to his alleged disabilities that he could no longer do, he answered only "work." (R. 204, 213).

## C.  Consulting Physicians

The administrative record contains evaluations by two physical consulting physicians and two psychiatric consulting physicians.

### 1. Physical Consultative Examinations

Dr. John Fkiaras provided an evaluation of Plaintiff on November 30, 2012. (R. 469-72). Plaintiff reported right hip pain that had lasted since 2010 and daily headaches. (R. 469). Regarding his right hip pain, Plaintiff stated that it occurred four times per week, and that when it occurred, it was a ten out of ten, and radiated to his right knee. (R. 469). He indicated that walking more than half of one block, climbing up more than three to four stairs, lifting and standing exacerbated his pain. (R. 469). Plaintiff reported that oral medication provided mild relief. (R. 469). Regarding his headaches, Plaintiff told Dr. Fkiaras that he was assaulted with an ice pick in 2008, after which he was in a coma for three days and underwent two brain surgeries. (R. 469). He reported that, at the time of the examination, he suffered from daily headaches in the left temporal and left parietal region, and that the pain, which he characterized as a ten out of ten, was throbbing. (R. 469). He indicated that sound, light and any activity exacerbated his headaches, and that a dark, quiet room alleviated them. (R. 469). Finally, he claimed that he followed up with a neurologist one to two times monthly. (R. 469). As for his activities of daily living, Plaintiff stated that he did not cook, clean, do laundry, shop, shower or bathe, but that he dressed daily. (R. 470).

During the physical examination, Plaintiff did not appear to be in acute distress, and his gait was normal. (R. 470). He was able to walk on heels and toes without difficulty, had a normal stance and did not use an assistive device, but could only squat one half of the way. (R. 470). He did not require help changing for the exam, getting on or off the exam table, or rising from the chair. (R. 470). Dr. Fkiaras further noted that Plaintiff had a full range of motion of the shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally, and that his joints were stable and nontender. (R. 471). However, an x-ray of his right hip revealed degenerative joint

disease, or osteoarthritis. (R. 471, 473). Dr. Fkiaras assessed his strength as five out of five in both upper and lower extremities, as well as in his grip strength bilaterally, and found his hand and finger dexterity was intact. (R. 471).

Dr. Fkiaras diagnosed Plaintiff with: (i) right hip pain; (ii) history of head trauma; (iii) history of two brain surgeries; and (iv) chronic headaches. (R. 471). His prognosis was fair. (R. 471). He concluded that Plaintiff had moderate to marked limitations for tasks that required sustained concentration, due to his headaches and his history of head trauma, coma and brain surgery. (R. 471-72). He further found that Plaintiff had marked limitations for lifting, carrying, pushing and pulling, due to his chronic headaches and history of brain surgery. (R. 471). Finally, he determined that Plaintiff had a moderate limitation in his ability to squat, kneel and crouch, due to his right hip pain. (R. 472).

Dr. Ted Woods provided a second evaluation of Plaintiff on June 4, 2013. (R. 316-19). He noted that Plaintiff declined to change into an examination gown, and was uncooperative throughout most of the interview portion of the exam. (R. 316). Plaintiff reported right knee pain, which he characterized as a ten out of ten. (R. 316). He described the pain as intermittent, for the "last few years." (R. 316). He told Dr. Woods that he could walk very well and climb many flights of stairs when not in pain, but could not walk or climb stairs at all when he was in pain. (R. 316). Regarding his right hip pain, Plaintiff reported to Dr. Woods that it began at the same time as his knee pain, and described it in the same manner, including intermittent occurrence. (R. 316). Plaintiff said that he was being treated by his primary care physician, but had not received physical therapy or injections for his knee or hip pain. (R. 316). As for Plaintiff's headaches, he told Dr. Woods that they started "about five years ago." (R. 316). He described the injury and surgery, but stated that, to his knowledge, he did not suffer from any

brain damage. (R. 316). He ranked the pain as a ten out of ten. (R. 316). Plaintiff also reported

that he experienced dizziness when he had headaches, and that his headaches occurred three to

four times daily, for as long as six minutes at a time. (R. 316). Unlike at his appointment with

Dr. Fakiaras, he denied photophobia or sensitivity to sound. (R. 316-17). Also contrary to his

report to Dr. Fakiaras, he indicated that, in terms of activities of daily living, he was able to cook,

clean, do laundry, shop, shower, bathe and dress himself. (R. 317). In terms of hobbies, he went

to the park and enjoyed watching TV. (R. 317).

Upon physical examination, Dr. Woods' findings were similar to the findings of Dr.

Fakiaras. (R. 317-19). The only notable difference was that Plaintiff was able to fully squat. (R.

317). An x-ray of his right knee was negative. (R. 319-20). Dr. Woods diagnosed Plaintiff with:

(i) history of right knee pain; (ii) history of right hip pain; and (iii) history of headache. (R. 319).

He found that Plaintiff's prognosis was good, and that he had no limitations in his abilities to sit,

stand, push, pull, climb or carry heavy objects. (R. 319). He did, however, advise that Plaintiff

should avoid heights and uneven surfaces due to his history of dizziness. (R. 319).

## 2. Psychiatric Consultative Examinations

Dr. Michael Kushner completed a psychiatric evaluation of Plaintiff on November 30,

2012. (R. 464-67). Plaintiff took the subway to his appointment, and reported to Dr. Kushner

that he was homeless and "living on the streets." (R. 464). He indicated that he received a high

school diploma and a four-year college degree. (R. 464). Plaintiff said that he was last employed

in 2008 as a security guard, a position that lasted for less than one year before he developed

medical problems which he claimed prevented him from working. (R. 464). Dr. Kushner

reviewed Plaintiff's medical history, including his head injury, and noted that he had no history

of psychiatric hospitalizations or outpatient treatment. (R. 464).

Regarding symptoms, Plaintiff indicated that he woke up twice a night. (R. 464). Otherwise, he reported normal appetite, and that he had no depressive or anxiety-related symptomatology. (R. 464). Upon examination, Dr. Kushner found that Plaintiff's demeanor and responsiveness to questions were cooperative, and that his manner of relating, social skills and overall presentation were fair. (R. 465). He found that his thought processes were coherent and goal-directed. (R. 465). While his affect "seemed somewhat restricted," his mood was neutral and his attention and concentration were intact. (R. 465-66). Dr. Kushner reported that Plaintiff's recent and remote memory skills were only mildly impaired, that his cognitive functioning was average, and that his insight and judgment were good. (R. 465).

With regard to Plaintiff's activities of daily living, Dr. Kushner noted that Plaintiff did not dress, bathe or groom himself on a daily basis, and did not do any household activities because he was homeless. (R. 465). However, he reported that he managed his own money and took public transportation. (R. 465). Plaintiff told Dr. Kushner that he did not socialize with other people or have good family relationships, and that he spent his days looking for housing. (R. 466).

Dr. Kushner found that Plaintiff could: (i) follow and understand simple directions and instructions; (ii) perform simple tasks independently; (iii) maintain attention and concentration; (iv) maintain a regular schedule; (v) learn new tasks; (vi) make appropriate decisions; (vii) relate adequately with others; and (viii) deal appropriately with stress. (R. 466). He observed that Plaintiff might be able to perform complex tasks with supervision. (R. 466). Dr. Kushner concluded that his evaluation of Plaintiff was not consistent with any psychiatric or cognitive problems that would significantly interfere with his ability to function on a daily basis, and that his prognosis was good. (R. 466-67). Finally, he found that Plaintiff would "probably be able to

manage his own funds," but, due to his homelessness, it might be "prudent" for him to receive assistance managing any funds. (R. 467).

Plaintiff saw Dr. Haruyo Fujiwaki for a second psychiatric evaluation on June 4, 2013. (R. 312-15). Dr. Fujiwaki, like Dr. Kushner, noted that Plaintiff took the subway to the appointment. (R. 312). Dr. Fujiwaki reviewed Plaintiff's medical and psychiatric history, again noting that Plaintiff had no history of psychiatric hospitalizations or treatment. (R. 312). Regarding symptoms, Plaintiff reported normal sleep and appetite, and denied depressive or anxiety-related symptoms, as well as any psychiatric problems. (R. 312).

Upon examination, Dr. Fujiwaki found that Plaintiff was extremely irritable. (R. 313). Further, his demeanor and responsiveness to questions were resistant, hostile and irritable, and his manner of relating, social skills and overall presentation were poor. (R. 312-13). Dr. Fujiwaki found that his thought processes were coherent and goal-directed, that his affect was irritated and his mood was neutral. (R. 313). Additionally, Dr. Fujiwaki found that his attention and concentration, as well as his recent and remote memory skills, were mildly impaired, his insight was fair, and his judgment was fair to poor, due to his irritability. (R. 313). Plaintiff's intellectual functioning was assessed as slightly below average. (R. 313).

Regarding activities of daily living, Plaintiff reported to Dr. Fujiwaki that he was able to dress, bathe and groom himself. (R. 313). He reported doing household chores at home, and that he could manage money and take public transportation alone. (R. 13-14). Plaintiff indicated that he did not socialize or have friends, but that he had good family relationships. (R. 314). In terms of hobbies, Plaintiff sometimes went to a park. (R. 314).

Dr. Fujiwaki found that Plaintiff was able to: (i) follow and understand simple directions and instructions; (ii) perform simple tasks independently; and (iii) maintain a regular schedule.

However, Dr. Fujiwaki found that Plaintiff was mildly impaired in maintaining attention and concentration, as well as learning new tasks, performing certain complex tasks independently, and making appropriate decisions. (R. 314). The doctor found marked impairments in his ability to relate with others and deal with stress appropriately. (R. 314). Dr. Fujiwaki gave Plaintiff a prognosis of fair, recommended he receive psychological and psychiatric treatment, and concluded that he would be able to manage his own funds. (R. 314).

## D. Residual Functional Capacity ("RFC") Assessments

The state agency consultant, T. Harding, Ph.D., completed a psychiatric review technique form ("PRTF") on June 28, 2013. (R. 70, 79-80). Dr. Harding reviewed the period from August 1, 2008 until December 31, 2011, but found there was insufficient evidence to substantiate the presence of an affective disorder. (R. 70, 79-80). There is no physical RFC assessment in the record. (R. 71).

## E. Testimony during September 22, 2014 Hearing before ALJ Dorf

Plaintiff testified at the September 22, 2014 hearing before ALJ Dorf. (R. 33-51). A medical expert, Dr. Steven Goldstein, and a vocational expert, Dr. Gerald Belchick, testified by phone. (R. 51-57). Plaintiff was represented by an attorney, who asked questions of Plaintiff and the experts. (R. 57-63).

The ALJ first reviewed Plaintiff's medical record and history, including his treatment by Dr. Alvarez; consultative examinations by Dr. Woods, Dr. Fujiwaki, Dr. Kushner and Dr. Fkiaras; and treatment records from Mount Sinai, HHC and NGFHC. (R. 38-39). He noted some difficulty obtaining records from Woodholme Hospital because Plaintiff was treated there under his prior name, but concluded that those records were not necessary because they related to treatment that pre-dated his head injury by five to ten years. (R. 38, 46-47). Plaintiff's counsel

reported that surgical records were missing from Pelham Hospital from 1996, and the ALJ decided that he and Plaintiff's counsel would seek to obtain those records within 30 days after the hearing. (R. 37-38).  ALJ Dorf also noted Plaintiff's work history, which included substantial gainful activity. (R. 39-40).

Upon questioning by the ALJ, Plaintiff testified that, although he had a mailing address, he was homeless. (R. 41).  He reported that he completed high school and four years of college, and had earned a degree in Business Management Administration. (R. 41-42).  He stated that he had not worked since 2008 and that he was supported by welfare. (R. 42).  When asked about his work in 2007, Plaintiff repeatedly testified that he did not remember what type of work he performed. (R. 42).  He did recall working before that as a telemarketer and at several warehouses, loading trucks. (R. 43-44).

Plaintiff testified that his alleged disabilities began in 2008.[8] (R. 47).  He testified that he had headaches three to five times per week, and estimated that each headache lasted approximately five minutes. (R. 44, 49).  He described his previous head injury, testifying that he was "stabbed in the head" in 1997 and was in a coma for several days thereafter, and that he had undergone two operations on the left side of his head. (R. 45).  The ALJ asked Plaintiff to explain how, if his injury occurred in 1997, he was able to successfully work until 2008. (R. 47).  Plaintiff explained that "after the injury everything was all right, and even then I was suffering little headaches, but . . . I was taking it as normal migraines, so I'd take a couple Tylenol." (R. 47-48).  He further explained that the reason the headaches kept him from working was because of the blackouts he experienced after a headache, but then testified that the blackouts did not

---

[8] Regarding the alleged onset date of August 1, 2008, Plaintiff testified that the exact date was selected by his initial interviewer, because he could not remember an exact onset date, but confirmed that his alleged disabilities started in 2008. (R. 47).

begin until 2012. (R. 49).  When asked to explain his disability between 2008 and 2012, if the reason he could not work did not develop until 2012, Plaintiff clarified that he was disabled in 2008 because of the headaches, and that they were "so intense and so severe that they prevent[ed] him from doing anything else." (R. 50).  He said that there was no traumatic event in 2008 that triggered the headaches, but that "they just started getting worse." (R. 48).  Plaintiff reported that he took medication and saw Dr. Alvarez for his headaches. (R. 49).  Regarding his fainting spells or blackouts, he explained that from 2008 until 2011 he was "just suffering terrible, intense migraine headaches," but that on August 4, 2012, he began "losing consciousness." (R. 48).  He recalled that at that time, he "suffered headaches and blackouts for the whole entire week." (R. 51).

The medical expert, Dr. Goldstein, testified after Plaintiff. (R. 51).  He stated that, in his opinion, Plaintiff's medical record showed that he had some osteoarthritis in the right hip. (R. 52).  Regarding Plaintiff's headaches, based on their brief but intense nature, he believed Plaintiff had "some type of neuralgia," which is "an irritation of some of the nerves in the scalp," that may be related to the craniotomy. (R. 52-53).  He suggested that medication could easily provide relief, but that neuralgia would affect an individual's ability to concentrate for the duration of the headaches. (R. 52).  Dr. Goldstein determined that Plaintiff did not meet or equal any listing, and that, in terms of exertional limitations, due to the osteoarthritis in his right hip, he would limit Plaintiff to light work. (R. 54).  He concluded that, at the very least, Plaintiff could stand or walk six hours in a day, frequently lift and carry ten pounds, and occasionally 20 pounds. (R. 54).

The vocational expert, Dr. Belchick, testified next. (R. 54). ALJ Dorf asked Dr. Belchick to consider the following hypotheticals: based on two RFC levels, sedentary and light,[9] an individual who: (i) was limited to simple, repetitive work at low stress, defined as occasional contact with the public; (ii) had no limitations on contact with co-employees and supervisors; (iii) could perform occasional postural activities, but with no climbing; (iv) could tolerate occasional exposure to dust, dirt, fumes and temperature extremes; (v) could not drive; (vi) could not be exposed to unprotected heights; and (vii) could not operate heavy machinery. (R. 55-56). He concluded that the following three jobs would be appropriate for an individual capable of light work subject to the hypothetical limitations: (i) office aide, DOT 239.567-010; (ii) mail clerk, DOT 209.687-026; and (iii) bench assembler, DOT 706.684-022. (R. 56, 60-61). For an individual capable only of sedentary work and subject to the hypothetical limitations, the vocational expert provided the following jobs: (i) surveillance system monitor, DOT 379.367-010; and (ii) bench hand or final assembler, DOT 713.687-013. (R. 61-62).

Finally, Plaintiff's counsel questioned Plaintiff and both experts. (R. 57-62). Plaintiff clarified that his blackouts lasted for over five minutes, and that after he recovered from a blackout he felt "disoriented and dizzy" until his "equilibrium gets right." (R. 57). He further testified that it took him approximately half of one hour to recover from such loss of equilibrium. (R. 58-59). Upon questioning by the ALJ, the medical expert stated that nothing in the record would suggest that he suffered from these blackouts. (R. 57-59). Plaintiff's counsel pointed Dr.

---

[9] Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a) and 416.967(a). Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

Goldstein to the letter from Dr. Alvarez, but the ALJ dismissed the letter as "simply a repeat of the claimant's allegations," and Dr. Goldstein agreed. (R. 58). Plaintiff's counsel concluded by confirming with the vocational expert and the ALJ that if the hypothetical individual was required to be "off task" approximately ten percent of the work day, there would be no jobs available. (R. 62).

**F. ALJ Dorf's Decision**

ALJ Dorf applied the five-step approach in his November 4, 2014 decision. (R. 11-23). At the first step, he found that Plaintiff had not engaged in "substantial gainful activity since August 1, 2008, the alleged onset date." (R. 13).[10] At the second step, the ALJ determined that Plaintiff had the following severe impairments: (i) headaches; (ii) syncope; (iii) osteoarthritis of the right hip; and (iv) major depressive disorder. (R. 13). Regarding Plaintiff's right knee pain, the ALJ found that it was not a medically determinable impairment. (R. 13-14). At the third step, ALJ Dorf held that Plaintiff did not have a medically determinable impairment or a combination of impairments that were listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14). Regarding Plaintiff's osteoarthritis of the right hip, the ALJ considered Listing 1.02(A), (R. 14); he also considered Listing 11.00 regarding neurological disorders, (R. 14). With regard to Listing 12.04 for affective disorders, the ALJ noted his consideration of the "paragraph B" criteria and his findings that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace and no episodes of decompensation of extended duration. (R. 14-15). Because Plaintiff's mental impairment did not cause at least two marked limitations, or one marked limitation and repeated episodes of decompensation, each of extended duration, the ALJ found the "paragraph

---

[10] With regard to Plaintiff's DIB claim, ALJ Dorf also found that Plaintiff met the insured status requirements through December 31, 2011. (R. 13).

B" criteria were not satisfied. (R. 15). ALJ Dorf also found that the evidence failed to establish the presence of "paragraph C" criteria. (R. 15).

The ALJ then determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), subject to the following limitations: (i) simple repetitive tasks; (ii) at low stress, defined as occasional contact with the public; (iii) never climbing; (iv) occasionally engaging in all other postural activities; (v) occasionally being exposed to dust, dirt, fumes and temperature extremes; (vi) never driving; (vii) never being exposed to unprotected heights; and (viii) never operating heavy machinery. (R. 15-16). The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible. (R. 16). The ALJ discussed Plaintiff's allegation that he could not work because of episodic headaches, which he characterized as Plaintiff's "chief complaint," and because of brief episodes of syncope and right hip pain. (R. 16-17).

Regarding Plaintiff's physical limitations, the ALJ reviewed records from the two consultative examinations. (R. 17). The ALJ noted that at Plaintiff's November 30, 2012 examination, Dr. Fkiaras indicated that Plaintiff "could only squat 50% of normal," and that an x-ray from that time showed mild inferomedial degenerative disease. (R. 17). However, a musculoskeletal examination revealed entirely normal findings, including normal gait and a full range of motion in the hips bilaterally. (R. 17). The ALJ proceeded to observe that the June 4, 2013 consultative examination by Dr. Woods showed, upon physical examination, "completely benign findings," which included a full squat. (R. 17).

Regarding Plaintiff's mental health impairment, the ALJ noted that Plaintiff generally denied psychiatric complaints or depressive symptoms. (R. 17). ALJ Dorf nevertheless noted that Plaintiff was diagnosed with major depressive disorder, and reviewed reports from the two psychiatric consultative examiners, Dr. Kushner and Dr. Fujiwaki. (R. 17-18). The ALJ noted that, at Plaintiff's November 30, 2012 examination with Dr. Kushner, he exhibited a cooperative demeanor and fair manner of relating, social skills and overall presentation, as well as average cognitive functioning, but that his affect was somewhat restricted. (R. 17). He further noted that Dr. Kushner found Plaintiff's memory skills were mildly impaired, but that his attention and concentration were intact. (R. 17). The ALJ proceeded to review the second psychiatric consultative examination, with Dr. Fujiwaki on June 4, 2013, and noted that he traveled to that examination by train. (R. 18). The ALJ reported that Dr. Fujiwaki found that Plaintiff's demeanor and responsiveness to questions were resistant, hostile and irritable, that his manner of relating, social skills and overall presentation were poor, that his affect was irritated, but that his mood was neutral. (R. 18). The ALJ noted that Dr. Fujiwaki's examination revealed intellectual functioning slightly below average, with mildly impaired attention, concentration and memory skills. (R. 18).

The ALJ next explained the weight he gave to opinion evidence in the record. (R. 18-20). He gave some weight to each of the FEGS doctors' opinions. (R. 18). Regarding Dr. Han's opinion that he did not have any limitations and that his condition was stable for employment, the ALJ explained that although he found the opinion was partially consistent with the record, Plaintiff's severe impairments caused more than minimal interference with his work-related functioning. (R. 18). Likewise, he gave some weight to Dr. Hussain's opinion that Plaintiff could lift a maximum of 20 pounds, one to ten times per hour, and that Plaintiff could only work

in a low-stress environment. (R. 18).  He explained that although the opinion was largely consistent with evidence in the record, it was very limited and did not address postural limitations. (R. 18).

ALJ Dorf explained that he gave little weight to the global assessment of functioning ("GAF") provided by Dr. Tammala Naidu, whom he presumably thought was Plaintiff's treating psychiatrist. (R. 18, 260).  However, it is clear from the record that Dr. Naidu did not in fact examine Plaintiff; the assessment appears to relate to another patient and, presumably, was included inadvertently. (R. 260).  Dr. Naidu's GAF assessment is thus unrelated to this case.

Turning to the consultative examiners' opinions, the ALJ gave Dr. Kushner's opinion some weight. (R. 19).  He explained that while it was partially consistent with evidence in the record, he found Plaintiff had limitations that Dr. Kushner did not identify, specifically, relating to others and appropriately dealing with stress. (R. 18-19).  The ALJ gave significant weight to Dr. Fujiwaki's opinion regarding Plaintiff's functioning. (R. 19).  That opinion concluded, *inter alia*, that Plaintiff retained the ability to follow and understand simple directions and instructions, perform simple tasks independently, and maintain a regular schedule, but noted marked limitations in Plaintiff's ability to relate with others and deal with stress appropriately. (R. 19).  He justified the significant weight given to this opinion by explaining that it was based on Dr. Fujiwaki's direct observations, and was reinforced by objective findings throughout the record. (R. 19-20).  ALJ Dorf gave limited weight to the opinion of Dr. Fkiaras, finding that his opinion that Plaintiff had moderate to marked limitations in sustaining concentration, and marked limitations in lifting, carrying, pushing and pulling, "overstate[d] the degree of his limitations." (R. 19).  He found these limitations were poorly supported by the record, especially in contrast to Plaintiff's "broad" activities of daily living. (R. 19).  He further noted that Dr.

Fkiaras practiced family medicine, and lacked the appropriate specialization to comment on Plaintiff's mental functioning. (R. 19). The ALJ gave some weight to the opinion of Dr. Woods that Plaintiff had no limitations in his abilities to sit, stand, push, pull, climb or carry heavy objects, but that Plaintiff should avoid heights and uneven surfaces due to his history of dizziness. (R. 20). The ALJ found that Plaintiff's need to avoid heights was supported by the documented history of headaches and syncope, but that Dr. Woods did not identify any exertional limitations, and failed to adequately accommodate his headaches and right hip condition. (R. 20).

Finally, ALJ Dorf gave great weight to the opinion of Dr. Goldstein, the medical expert, that Plaintiff's headaches could be neuralgia, that he did not meet or medically equal any listing, and that, due to the osteoarthritis in his right hip, he was limited to light exertional work. (R. 20). The ALJ explained that the specific bases Dr. Goldstein provided for his opinion were supported by the objective medical evidence. (R. 20).

The ALJ found that Plaintiff's allegations were not entirely credible, as there was little evidence to support the allegation that Plaintiff's activities of daily living had been restricted to the degree Plaintiff claimed based on his impairments. (R. 20). He noted, for example, that Plaintiff acknowledged being able to wash dishes, wash clothes, sweep and mop floors, vacuum, make beds, shop for groceries, cook meals, use public transportation, read, count change, socialize, dress himself, bathe himself, groom himself and use the toilet. (R. 20). He further noted that, although Plaintiff claimed his headaches were extremely painful and disabling, they occurred only three to five times per week, for five minutes at a time. (R. 20). Regarding Plaintiff's alleged blackouts, he observed that they were not reflected anywhere in the medical evidence of record. (R. 20). As for the pain in his right hip, the ALJ noted that Plaintiff had no

difficulty ambulating. (R. 21). Finally, he noted that Plaintiff had not sought any treatment for his mental impairment. (R. 21). For these reasons, ALJ Dorf found that Plaintiff's allegations were not fully credible. (R. 21).

At the fourth step, the ALJ determined that Plaintiff was not capable of performing his past relevant work, telemarketing, (DOT 229.357-014), or loading/unloading trucks, (DOT 909.687-014), (R. 21). He noted that Plaintiff was a younger individual on the alleged onset date, with at least a high school education, and was able to communicate in English. (R. 21). At the fifth step, ALJ Dorf considered Plaintiff's age, education, work experience and residual functioning capacity, and found that jobs exist in significant numbers in the national economy that Plaintiff could perform. (R. 21). In reaching this conclusion, the ALJ consulted a vocational expert. (R. 21). The vocational expert testified that an individual with Plaintiff's age, education, work experience and residual functional capacity would be able to perform the following representative jobs: (i) office aide, (DOT 239.567-010); (ii) mail clerk, (DOT 209.687-026); and (iii) bench assembler, (DOT 706.684-022).[11] (R. 22). Based on the vocational expert's testimony, and considering Plaintiff's age, work experience and RFC, the ALJ determined that Plaintiff was capable of making a successful adjustment to other work that exists in the national economy, and was not disabled. (R. 23). He concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from August 1, 2008 through the date of the decision. (R. 23).

## II. DISCUSSION

Plaintiff, who is now appearing *pro se*, opposes the Commissioner's motion and argues the ALJ's decision should be overturned. (Docket No. 24 at 2). Essentially, he argues that ALJ

---

[11] The expert further testified that the jobs existed in the following numbers in the national economy, respectively: (i) 77,000 positions; (ii) 102,000 positions; and (iii) 219,000 positions.

Dorf's decision is not supported by substantial evidence, that the ALJ failed to fully develop the record, and that the evidence supports a finding of disability.[12] (Docket No. 24). In particular, Plaintiff takes issue with the ALJ's reliance on his established functional abilities and activities of daily living, and the weight he accorded to the consultative examiners and medical expert. (Docket No. 24 at 3, 7-11).[13] The Commissioner contends that the ALJ's decision was legally correct and was supported by substantial evidence. (Docket No. 14).

## A. Legal Standards

A claimant is disabled and entitled to disability benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant

---

[12] Plaintiff also filed a motion for change of venue, requesting that his case be moved from the United States Courthouse of the Southern District of New York in White Plains to the United States Courthouse of the Southern District of New York in Manhattan. (Docket No. 23). First, the Court notes that both Courthouses are of the Southern District of New York, and thus comprise the same venue. Second, Rule 21 for the Division of Business Among Judges of the Local Rules of the United States District Court for the Southern District of New York explains that "[s]ocial security cases . . . shall be assigned proportionately to all judges of the Court, whether sitting in White Plains or Manhattan." The Court further notes that the location of the United States Courthouse is not relevant to where Plaintiff or any witnesses would testify if a second administrative hearing is held, as that hearing is before an ALJ, not a United States District or Magistrate Judge. Finally, the Court notes that, to the extent Plaintiff must appear in White Plains, he has already been accommodated by appearing by phone. (Minute Entry for proceedings held before Magistrate Judge Judith C. McCarthy: Telephone Conference held on June 1, 2016).

[13] Regarding the ALJ's finding that Plaintiff had major depressive disorder, Plaintiff maintains that he "has never claimed to have psychiatric problems and has always denied having any kind of mental disability." (Docket No. 24 at 3).

can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "'and bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (citation omitted).

**B. Standard of Review**

When reviewing an appeal from a denial of Social Security benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quotation marks and citations omitted). If the findings of the Commissioner are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The substantial evidence standard "is still a very deferential standard of review—even more so than the 'clearly erroneous' standard. The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder

would *have to conclude otherwise.*" *Brault*, 683 F.3d at 448 (emphasis in the original) (quotation

marks and citations omitted). "If evidence is susceptible to more than one rational interpretation,

the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149 (citation omitted).

Even if there is evidence on the other side, the Court defers "to the Commissioner's resolution of

conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted).

      However, where the proper legal standards have not been applied and "might have

affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty

to review the decision of the administrative agency by simply deferring to the factual findings of

the ALJ.  Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*,

377 F.3d 183, 189 (2d Cir. 2004) (quotation marks and citation omitted).

## C. The Treating Physician Rule

      In determining an applicant's RFC, the ALJ must apply the treating physician rule, which

requires the ALJ to afford controlling weight to the applicant's treating physician's opinion when

the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R.

§§ 404.1527(c)(2), 416.927(c)(2).  Thus, "'[a] treating physician's statement that the claimant is

disabled cannot itself be determinative.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011)

(quoting *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003)).  Moreover, if there is

substantial evidence in the record that contradicts or questions the credibility of a treating

physician's assessment, the ALJ may give that treating physician's opinion less deference.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (refusing to give controlling weight to

treating physicians' opinions, as they were not supported by substantial evidence in the record);

*Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (same); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (same).

To discount the opinion of a treating physician, the ALJ must consider various factors and provide a "good reason." 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency with the record as a whole; (5) the specialization of the treating physician; and (6) other factors that are brought to the attention of the Court. *See Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The Second Circuit has made clear that the ALJ need not "slavish[ly] recit[e] . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Molina v. Colvin*, No. 13 Civ. 4701(GBD)(GWG), 2014 WL 2573638, at *11 (S.D.N.Y. May 14, 2014) (collecting cases).[14] What is required, however, is that the ALJ provide "good reasons" when not affording controlling weight to a treating physician's opinion. *Selian*, 708 F.3d at 419 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(c)(2)); *see also Petrie*, 412 F. App'x at 407 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) ("[W]here 'the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'").

---

[14] In accordance with *Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to the *pro se* Plaintiff.

It is clear from the record that Plaintiff's primary treating physician was Dr. Alvarez. For example, Plaintiff repeatedly listed Dr. Alvarez as his treating physician on SSA worksheets as well as on disability and function reports. (R. 200, 211, 213, 235, 248, 250, 254). The record also indicates that Plaintiff saw Dr. Alvarez on at least seven occasions from 2010 to 2012. (R. 481, 485, 492, 496, 505, 511, 519). At the hearing, Plaintiff testified that he saw Dr. Alvarez for his headaches. (R. 49). Dr. Alvarez provided one opinion, a letter dated December 31, 2013, addressed "to whomever it may concern," that described the nature of his relationship with Plaintiff, that he suffered from "chronic headaches," and that he recently had "episodes of loss of consciousness." (R. 323). He provided that, in his opinion, Plaintiff's "health status would make it challenging to be productive in a competitive work environment." (R. 323). In addition, Plaintiff reported to Dr. Fkiaris that he saw a neurologist one to two times per month, was seen by neurologist Dr. Zhou on at least two occasions, and indicated that neurologist Dr. Mayson treated him for headaches. (R. 213, 469, 478, 515).

Because Dr. Alvarez was Plaintiff's primary treating physician, his opinion was entitled to controlling weight, unless the ALJ had "good reasons" to discount it. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). However, ALJ Dorf provided no reason for discounting Dr. Alvarez's opinion; in fact, he made no mention of Dr. Alvarez or his opinion in the entire decision.[15, 16] (R. 11-23). There is no indication that he "adhere[d] to the regulation." *Atwater*, 512 F. App'x at 70. The ALJ thus failed to apply the treating physician rule, which is an

---

[15] The ALJ did address Dr. Alvarez's opinion at the hearing, when he described it as "simply a repeat of the claimant's allegations." (R. 58). Thus, ALJ Dorf was aware of the opinion, and apparently discounted it, but did not explain or even mention this in his decision.

[16] While the ALJ did explain that he gave "little weight" to the opinion of psychiatrist Dr. Naidu, whom ALJ Dorf presumably thought was a treating physician, as described, *supra*, in Section I(F), Dr. Naidu's assessment is in fact of a different patient, not of Plaintiff, and is therefore irrelevant to this case. Any reliance the ALJ placed on Dr. Naidu's opinion was therefore misplaced, and does not satisfy the treating physician rule.

appropriate ground for remand. *See, e.g., McAllister v. Colvin*, No. 15-CV-2673 (JFB), 2016 WL

4717988, at *16-17 (E.D.N.Y. Sept. 9, 2016) (remanding for failure to apply the treating

physician rule and failure to address the factors in 20 C.F.R. § 404.1527(c)(2), where "the ALJ

failed to apply the proper standard for evaluating the opinion of [the treating physician] because

he did not even mention [the treating physician] in his opinion."); *Truesdale v. Barnhart*, No. 03

Civ. 0063(SAS), 2004 WL 235260, at *6 (S.D.N.Y. Feb. 6, 2004) (remanding where the ALJ

made no mention of treating physicians' opinions and thereby failed to provide any reason for

discrediting those opinions). Upon remand, the ALJ should evaluate Dr. Alvarez's opinion

under the treating physician rule and consider the factors set out in 20 C.F.R. § 404.1527(c)(2)-

(6).

  Even if the ALJ had abided by the treating physician rule and given Dr. Alvarez's

opinion controlling weight, or provided good reasons why it did not merit controlling weight, he

should seek additional opinions or medical source statements from Dr. Alvarez and from

Plaintiff's other treating physicians, including Dr. Zhou and Dr. Mayson, under his duty to

develop the record, as discussed, *infra*, in Section II(D). He should then consider those opinions

under the treating physician rule.

**D. Duty to Develop the Record**

  The ALJ has an affirmative obligation to develop the record due to the nonadversarial

nature of the administrative proceeding. *Burgess*, 537 F.3d at 128 (citations omitted). This duty

to develop the record remains where the claimant is represented by counsel. *Shaw v. Chater*, 221

F.3d 126, 131 (2d Cir. 2000). The ALJ must seek additional evidence or clarification where the

documentation "from a claimant's treating physician, psychologist, or other medical source is

'inadequate . . . to determine whether [the claimant] is disabled.'" *Antoniou v. Astrue*, No. 10-

CV-1234 (KAM), 2011 WL 4529657, at *13 (E.D.N.Y. Sept. 27, 2011) (alterations in original)

(citations omitted).  On the other hand, if "there are no obvious gaps in the administrative record,

and the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to

seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting

*Perez,* 77 F.3d at 47).

   This duty to develop the record "dovetails with the treating physician rule." *Oliveras ex*

*rel. Gonzalez v. Astrue*, No. 07 Civ. 2841(RMB)(JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May

30, 2008), *report and recommendation adopted*, No. 07 Civ. 2841 (RMB)(JCF), 2008 WL

2540816 (S.D.N.Y. June 25, 2008).  "The combination of these two principles, 'compels the ALJ

. . . to obtain from the treating source expert opinions as to the nature and severity of the claimed

disability. . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to

discharge his duties . . . under the treating physician rule.'" *Id.* (quoting *Pabon v. Barnhart,* 273

F. Supp. 2d 506, 514 (S.D.N.Y. 2003) (alteration in original) (quoting *Peed v. Sullivan,* 778 F.

Supp. 1241, 1246 (E.D.N.Y. 1991))).  Furthermore, it is essential that

> the ALJ must obtain the treating physician's opinion regarding the claimant's
> alleged disability; 'raw data' or even complete medical records are insufficient by
> themselves to fulfill the ALJ's duty. . . . It is the *opinion* of the treating physician
> that is to be sought; it is his *opinion* as to the existence and severity of a disability
> that is to be given deference.'

*Id.* (citing *Dimitriadis v. Barnhart,* No. 02 Civ. 9203 (DC), 2004 WL 540493, at *9 (S.D.N.Y.

Mar. 17, 2004)) (emphasis in original)); *see also Jimenez v. Massanari*, No. 00 CIV. 8957 (AJP),

2001 WL 935521, at *9-11 (S.D.N.Y. Aug. 16, 2001) (finding that "while the ALJ had all of

[Plaintiff's] medical records, that was not enough," and that "[t]he ALJ should have . . . obtained

more detailed opinions from [Plaintiff's] treating physicians," or advised Plaintiff that he could

seek opinions from his treating doctors.).

As described, *supra*, in Section II(C), it is abundantly clear that Dr. Alvarez was Plaintiff's treating physician. However, the record contains only one vague opinion from Dr. Alvarez, a letter addressed "to whomever it may concern."[17] (R. 323). The letter does not provide any specific analysis regarding the severity of Plaintiff's impairment, his prognosis, his physical or mental restrictions, or what he can still do despite his impairments. 20 C.F.R. 404.1527(a)(2). Dr. Alvarez wrote only that Plaintiff's health would make it "challenging to be productive in a competitive work environment." (R. 323). Opinions from treating physicians that are far more specific than Dr. Alvarez's letter have been deemed inadequate, and such lack of detail is reason to remand. *Dimitriadis*, 2004 WL 540493, at *10 (finding "[t]he sparseness of [a treating physician's] evaluation is further reason for a remand," where the opinion provided that Plaintiff had limitations doing heavy exercise, could not walk fast, and could not lift or run); *Pabon*, 273 F. Supp. 2d at 516-17 (remanding for failure to develop the record where treating physician's opinion did not address Plaintiff's ability to perform certain work-related activities).

In addition, Plaintiff's counsel alerted ALJ Dorf, in a request to adjourn the hearing, that Plaintiff's treating physician had not completed a medical source statement. (R. 138). The ALJ denied the adjournment request and, although he said that the case would be in post until records were received or for 30 days, he did not address the missing medical source statement from Plaintiff's treating physician at the hearing. (R. 37-38, 167). Finally, the record contains no opinions from Dr. Zhou or Dr. Mayson, despite Plaintiff's two visits to Dr. Zhou, his report to

---

[17] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. 404.1527(a)(2).

Dr. Fkiaris that he saw a neurologist one to two times per month, and his indication that Dr. Mayson treated him for headaches. [18],[19] (R. 213, 469, 478, 515).

For the foregoing reasons, ALJ Dorf did not fully develop the record, and the case should be remanded. Upon remand, the ALJ should "obtain detailed reports from [Plaintiff's] treating physicians, to the extent available, describing [Plaintiff's] diagnoses and physical/mental limitations, and how they affect his ability to perform various work-related activities." *Truesdale*, 2004 WL 235260, at *7. The ALJ should also inform Plaintiff, who is now *pro se*, that he may seek opinions or testimony from his treating physicians.[20] *Oliveras*, 2008 WL 2262618, at *7; *Jimenez*, 2001 WL 935521, at *11-12 (collecting cases regarding an ALJ's duty to inform a *pro se* plaintiff that he may seek a more detailed statement from his treating physician). "Remand is appropriate here, even if there is no guarantee that the outcome will change, so that the ALJ can make all reasonable efforts to obtain a treating physician's opinion." *Oliveras*, 2008 WL 2262618, at *7.

---

[18] The Court also observes that a number of treatment notes reflect that Plaintiff was advised to follow up with treating physicians or was referred to neurologists, but the record does not contain evidence of such appointments. (*E.g.*, R. 283, 289, 304, 480, 484, 494, 501, 518). Dr. Alvarez noted on July 31, 2012, that Plaintiff had not followed up to see a neurologist or undergo imaging for two years. (R. 498). While it is conceivable that the record lacks evidence of these numerous suggested appointments because Plaintiff did not make or keep them, upon remand, the ALJ should ensure that he has received all medical records from Plaintiff's various treating facilities.

[19] Plaintiff indicates in his brief that the record does not contain medical records from Dr. Michael Sein, Dr. Giron Fabio or his physical therapist, Yan Ma, regarding pain in both of Plaintiff's knees and his back. (Docket No. 24 at 12). Plaintiff did not submit additional evidence to the Appeals Council, (R. 1-3), nor did he submit additional evidence for this Court's review. Although Plaintiff's claims do not in and of themselves warrant remand, because remand is otherwise appropriate, the ALJ should seek medical records from the identified physicians and physical therapist if such records are relevant to the period at issue.

[20] Plaintiff contends that Dr. Alvarez would have testified had Plaintiff's case been heard in the Southern District of New York Courthouse in Manhattan. For the reasons set forth in n. 12, *supra*, whether this case is assigned to White Plains or Manhattan is not relevant.

### E. Substantial Evidence

Plaintiff contends that the ALJ's decision was not supported by substantial evidence. Specifically, he disputes the ALJ's reliance on Plaintiff's established functional abilities and activities of daily living, and the weight he accorded to the consultative examiners and medical expert. (Docket No. 24 at 3, 7-11). The ALJ's determination may ultimately be supported by substantial evidence, including Plaintiff's stated activities of daily living and the consultative examiners' report.[21] *See Mongeur*, 722 F.2d at 1039 (a consultative examiner's assessment may constitute substantial evidence). However, the Court cannot properly evaluate whether substantial evidence supports the ALJ's determination until the treating physicians' opinions have been obtained and properly weighed under the ALJ's duty to develop the record and the treating physician rule. "Where the ALJ has failed to develop the record, a reviewing court 'need not—indeed, cannot—reach the question of whether the Commissioner's denial of benefits was based on substantial evidence.'" *Oliveras*, 2008 WL 2262618, at *8 (quoting *Jones v. Apfel*, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999)); *see also Truesdale*, 2004 WL 235260, at *7 ("[B]ecause the Commissioner failed to fully develop the record and failed to explain why he discounted the opinions of the treating physicians that were contained in the record, [the court] cannot conclude that the Commissioner's finding of no disability is supported by substantial evidence.'"). Therefore, "any review of whether the decision was based on substantial evidence must be deferred until the record is complete." *Oliveras*, 2008 WL 2262618, at *8.

### III. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Commissioner's Motion for Judgment on the Pleadings should be denied, and the

---

[21] The Court notes, however, that at this time there is limited evidence regarding Plaintiff's mental impairment of major depressive disorder, given that Dr. Naidu did not in fact provide a GAF assessment of Plaintiff.

Commissioner's decision be vacated and the case be remanded for further proceedings consistent with this Report and Recommendation.

## IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Nelson S. Román at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Nelson S. Román and not to the undersigned. Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:     December 20, 2016
           White Plains, New York

                                        RESPECTFULLY SUBMITTED,

                                        _____
                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge